[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This decision dissolves the sixteen-year marriage of Wendy and Harry Boyd. The Judicial District of Stamford referred this fully contested case to the regional family trial docket for trial, held on seven days in July and August of this year. Each party testified at trial, as did the following other individuals:
 • Elizabeth Bergen, M.A., Ph.D., court-appointed evaluator, who prepared a custody evaluation dated October 29, 2001, and a custody evaluation update dated July 12, 2002;
 • Michael Gold, M.A.I., who prepared an appraisal of the marital home;
 • Susan Bruschi, a friend of the plaintiff and former customer of the defendant;
• Richard and Susan Wallaharra, friends of the defendant;
• Chris Van Collie, a friend of the defendant; and
• Michelle Buscher, a customer and friend of the defendant.
Each party and the court-appointed attorney for the minor child (AMC) also introduced various exhibits into evidence, including the custody studies prepared by Dr. Bergen.
 I — FINDINGS OF FACT
The court has observed the demeanor of the parties and evaluated their credibility. The court has carefully considered all of the evidence, including the exhibits and the testimony presented, according to the standards required by law. The court has carefully considered the CT Page 15681 statutory criteria for dissolving a marriage and entering orders regarding custody, visitation, child support, alimony, orders of life and health insurance and payment of the child's health expenditures, equitable distribution of property, and the award of counsel fees.
After making jurisdictional findings and a brief summary as to the background and situation of each party, the court will discuss the key issues here.
A. Jurisdictional Findings
The court finds that it has jurisdiction over the marriage, the first for each party. One party has resided in Connecticut continually for more than one year prior to the bringing of this action. The parties were married in Wilton, Connecticut, on May 4, 1986. They have one minor child who is legal issue of the marriage: Preston Boyd, who was born on July 7, 1987. No other minor children have been born to the wife since the date of the marriage. The parties have not been recipients of state assistance. The marriage between the parties has broken down irretrievably with no reasonable hope of reconciliation.
B. The parties
The plaintiff, Wendy Boyd, is 41 years old and in good health. She grew up in the town of Wilton and has lived there most of her life. While in college, she worked as a waitress. After graduating from Western Connecticut State College in 1982 with a business degree specializing in personnel matters, she worked at US Surgical in customer service until Preston's birth in July 1987. While at US Surgical, her annual earnings were in the $20,000 to $30,000 range. After Preston's birth, she stayed at home to care for him for the next four years. She then returned to work selling cosmetics at a retail department store on a part-time basis for the next ten years. In that job she worked three and a half hours on two or three evenings a week and seven hours on one weekend day, on Saturdays for three years and then on Sundays. She also worked extra hours during the holidays or for special promotions. In this part-time employment, she earned less than $20,000 per year. Shortly after filing this divorce action, she obtained full-time employment during the school year as a teacher's aide in the Wilton public schools. Her first salary there was approximately $17,000 but she has since received pay increases to a present salary of $21,212.94.
The defendant, Harry Boyd, is a successful self-employed general contractor who primarily renovates homes in Fairfield County. He is 53 years old and in reasonably good health. As soon as he was old enough, he CT Page 15682 worked in the family artesian well business after school, on weekends, and during the summers, and had little time for friends or social activities. After graduating in 1971 from the University of Connecticut with a degree in mechanical engineering, he went to work in the family business, in which he eventually became a partner, but after his father died in 1985, his brother and he closed the family business. The defendant then started his general contracting business, which he runs out of his house. He does not advertise, obtains clients by word of mouth, and has a lengthy waiting list of jobs. Many of his clientele are repeat customers. His annual business income in the three years ending with the year his wife filed for divorce was as follows:
 Year Gross Receipts Net Profit Reported to IRS Claimed on Joint Tax Return
 1998 $ 190,504 $ 107,838 1999 $ 220,311 $ 131,969 2000 $ 220,361 $ 137,120
On his financial affidavit filed two months after the plaintiff filed this action, he reported monthly gross income of $10,051.42, which annualizes to $120,617.04. On his financial affidavit filed at trial, he claimed "average gross monthly income (based on 2001)" as $11,336 and, after "expenses" of $1,595, "adjusted gross income" of $9,741; these figures would annualize to $136,032 gross and $116,892 net income.
The deterioration of this marriage largely results from three factors, all of which were exacerbated by the defendant's withdrawal and resolute unwillingness to communicate with the defendant: the parties' "dramatically different personalities;" "little attempt" by either party to separate from the family of origin and "create a new family life" of husband, wife, and child; and a "parenting style that could be described as a parallel manner of coordination rather than a collaborative process." (Def.'s ex. GG, Bergen Custody Evaluation dated October 29, 2001, at 8.)
The plaintiff is an outgoing, emotionally effusive individual. She is also anxious, somewhat needy, and lacks self-confidence. In her interactions with others, she will display the full gamut of emotions she is feeling, from joy to anguish. In therapy, she has worked on becoming more assertive and developing self-understanding and self-esteem. She is more perceptive than the defendant of the emotional and developmental needs of their son. The defendant, on the other hand, is quite reserved in his demeanor. Although he develops close relations with others, and his friends find him warm and loyal, he "shows little emotion when CT Page 15683 discussing events and feelings that ordinarily would be associated with greater affect." Id. When emotionally threatened, he withdraws rather than engages.
Although both parties described their courtship at trial as a pleasant and joyful time of their time, conflict began to arise soon into the marriage. Both parties remained extremely close to their parents. As Dr. Bergen so aptly described in her initial custody report,
 There was little attempt to create a new family of just the three of them. Instead they continued to work their new family into the demands of their family of origins, rather than forge their own traditions. . . . Traditional family times, such as vacations and holidays, were never seen as an opportunity to create new memories and meanings for their families.
Id. The defendant would leave home early each morning and go to his mother's house for breakfast and he would stop by her house in the evenings after work to read the paper and visit, even after Preston was born. The plaintiff also spent a lot of time with her family, but despite the amount of time he spent with his mother the defendant was unhappy about his wife's closeness to her family. The defendant believed that his wife, by telling her mother details about the marriage, was violating her duty of loyalty to him, and invading his privacy.
The parties spent all their holidays with the plaintiffs family; when the defendant once asked his wife to celebrate one of the holidays at their own home, she refused because, she told him, her mother would be "devastated" if they did not spend the day at the home of the maternal in-laws. The plaintiffs family took frequent vacations, going each year, for example, to Cancun every Christmas, the Cayman Islands in the summers, and frequently to Vermont for weekend or weeklong ski trips in the winters. The plaintiff went on those trips also, and after Preston was born took him with her as well, but the defendant stayed at home and worked.
On the home front, tension began to flare early in the marriage. Each party perceived the other as being too critical of the other. Yet they could find no methods to work out those differences or the relationships with their extended families. The defendant complained at trial that when the parties started talking, the plaintiffs voice "would go up an octave" in a manner that he found demanding, aggressive, and threatening. He saw her as having little control over her emotions. His response was to withdraw, virtually completely. The parties would go for weeks, many CT Page 15684 months, and once as long as a year in which the defendant simply would not talk to the plaintiff. He never even told his wife how bothered he was by her closeness to parents and sisters.
Twice in the early nineties, in 1992 and 1994, the defendant agreed, despite his reservations about the value of therapy — he testified at trial that he has never seen it benefit anyone — to the plaintiffs requests that they enter marriage counseling. Both times, the parties' relationship improved briefly, but soon they reverted to their basic patterns of mutual criticism back and forth, the plaintiffs emotional displays and the defendant's resulting withdrawal continued. In August 2000, two months before bringing this action, the plaintiff again asked the defendant to enter marriage counseling, but this time he refused. By that point, moreover, he had effectively given up on the marriage himself. A year earlier, in November 1999, an incident occurred in which he believed that the plaintiff had tried to run him over with one of their vehicles. Although the court, from both parties' account of this incident, does not find any intent on the plaintiffs part to injure the defendant in that incident, the defendant was convinced that she had tried to harm him; and he then stopped talking to her. By the time she filed the divorce complaint in November, they had not talked with each for many months.
C. The minor child, Preston
The parties' only child, Preston, turned fifteen during the trial of this case. He is in the tenth grade, takes honors classes, plays sports, has good relationships with his classmates, and does not present any behavior problems at either school or home. For virtually his entire life the plaintiff has arranged and supervised his activities and day-to-day life, making and taking him to doctor's appointments, monitoring his homework, etc. When the plaintiff first returned to work, when Preston was four, her weeknight work hours did not begin until after she had made him supper, and when she worked on Saturdays her parents took care of him. The defendant very much loved his son, but compared to his wife was, until Preston's teen years, much less involved in his son's life. He took care of Preston for the few hours on the evenings when his wife worked and when the plaintiffs weekend workday switched from Saturdays to Sundays, he assumed responsibility for Preston on that day.
In his personality and communication style, Preston resembles his father. Both are the reserved, quiet types. Dr. Bergen's description of Preston's "honest, no nonsense demeanor;" id at 7; fits both father and son. Preston has become increasingly close to his father in recent years, at the same time as becoming more distant from his mother. At this CT Page 15685 point in his life, he regards everything about his mother as bad, and about his father as good. He views his relationship with his mother as permanently damaged. He complains that she tries to direct and control too many of his activities and does not give him enough privacy. During a home visit with mother and son, Dr. Bergen observed some minor instances of this, such as the plaintiff telling her son she wanted him to eat dinner with her, on her night with her son under the pendente lite agreement, reminding him to do his homework, and answer certain questions that Dr. Bergen had directed to Preston. None of these instances, however, seems to warrant the rather extreme reaction that Preston has to his mother. It seems far more likely that the dynamics of this dissolution and custody dispute have led to this estrangement. Preston is mad and upset at his mother for filing the divorce that Preston repeatedly asked his mother not to file until after he gets out of high school.
The evidence also establishes that on several occasions the defendant engaged in conduct that had the effect of creating an alliance between Preston and himself in this custody dispute. (See, e.g., Def.'s ex. GG at 5.) The defendant told Preston, for example, that his mother wanted the divorce but he (the defendant) did not. Mr. Boyd told Preston that the plaintiff had tried to kill him (the defendant). The defendant has complained to Preston about the plaintiff, told Preston that he does not want to pay her alimony and that she is capable of earning more money than she presently is. Preston has even begun to take on some of his father's disputes with his mother. The defendant complained at trial about the plaintiff leaving the electricity and lights on too much in the marital home, while Preston has made the same complaints to her at home. The defendant has complained about the plaintiff using the air conditioning too much, as has Preston. Knowing that Preston has expressed a preference to his attorney and the court-appointed evaluator to live with his father, the defendant's position in testimony at trial was that Preston should be able to make the decision about where he will live. He has told Preston that he would not agree to mediation of this custody dispute — thereby obviously implying to Preston that he would not agree to compromise with any of the plaintiffs custody demands that he knows his son does not like. The court finds the conclusion of Dr. Bergen credible that the defendant and Preston have become so enmeshed in their alliance as to be against Preston's best interest.
Preston also prefers the defendant's "laissez faire" style of parenting to the plaintiffs more controlling and directive style. The defendant exercises virtually no supervision or control over Preston. He has completely abdicated decision-making regarding Preston and, in turn, empowered his son in ways that are not completely appropriate. His CT Page 15686 position is that Preston is a well-mannered, well-behaved child who has always made good choices in the past and can be completely trusted to continue making good choices. Although he has requested sole custody, his description of his plans for supervising Preston show little awareness of his son's need, at age fifteen, for continued adult supervision and guidance. For example, on Saturdays the defendant intends to continue working 8 1/2 to 9 hours, a work schedule that will leave Preston alone, and without sufficient adult supervision or guidance, for most of the day on those Saturdays when the defendant has parenting time. Mr. Boyd anticipates Preston waking up mid-morning on those days and checking in with his father by phone; and then the defendant plans to come home around noon to drive Preston to the Wilton Town Center, where Preston would hang out with friends until suppertime, or to drop Preston off at some other activity. The defendant would then return to work until 5:30.
Given the differences in parenting styles, the plaintiff controlling and directive, and the defendant affording his son full autonomy, it is perfectly logical and rational that this fifteen-year-old would want to live with the parent who will give him the most freedom and privacy and who was not the cause of what he perceives as disrupting his home life. Preston is sufficiently aware of his self-interest, however, that he has made it clear that though he does not want to live with his mother, he is perfectly willing to continue going on the many vacation trips, to the Cayman Islands, Cancun, and Vermont, on which she has always taken him.
 II — DISCUSSION A. Parenting Orders
The plaintiffs proposed orders seek an order of joint custody, with primary residence of the minor child. The defendant wants sole custody and primary residence. The minor child wants to reside primarily with his father and visit his mother but has not expressed any clear preference on the exact nature of the custody order. In deciding the custody and visitation orders, the court must be guided by the best interest of the child. In view of Preston's age, the court finds that he is capable of forming an intelligent preference that the court should take into consideration in deciding the appropriate parenting orders. See General Statues § 46b-56 (b). The court also finds, however, that Preston's expressed preference result, at least in some respect, from factors that do not reflect his best interest, including conduct by his father that elicited Preston's alliance with the defendant and his estrangement from his mother, and a normal adolescent desire for freedom and autonomy that his father accommodates excessively and his mother does not fully recognize. The court thus takes Preston's preference into consideration, CT Page 15687 but tempers its doing so with the court's own findings and conclusions about factors that affected that preference.
Many other factors also affect a best interest determination, which "involves weighing all the facts and circumstances of the family situation. Each case is unique." Gallo v. Gallo, 184 Conn. 36, 43,440 A.2d 782 (1981). The best-interest standard is necessarily fact-specific, giving the court wide discretion to consider all the different and individualized factors that might affect a specific child's welfare and best interest. See e.g. Seymour v. Seymour, 180 Conn. 705, 710ff, 433 A.2d 1005 (1980); Janik v. Janik, 61 Conn. App. 175, 181,763 A.2d 65 (2000), cert. den. 255 Conn. 940, 768 A.2d 949 (2001);Rudolewicz v. Rudolewicz, 12 CLT No. 39, p. 664, Superior Court, judicial district of Hartford-New Britain (October 6, 1986, Arena, J.) In making its decision here, this court has considered the body of case law regarding best interest, the specific facts of this case, the child's expressed preference, the testimony and credibility of the various witnesses here, and the court's assessment and evaluation of the best interest of the minor child affected here.
The facts of this case pose a true dilemma for determining the child's best interest. On the one hand, father and son are so closely allied to and aligned with each other that each has, in many ways, cut the plaintiff out of their lives. It is hard to imagine, for example, that an eighth grader would tear up his mother's ticket for his middle school graduation because he does not want her to cheer, wave, or take pictures while he made this rite of passage; but Preston has so adopted his father's aversion to his mother's displays of emotion that he did so. Preston trusts his father, confides in his father, and wants to spend time with his father.
On the other hand, the defendant has not always acted in Preston's best interest. Knowing Preston's desire that his parents not end their marriage while he is still at home, the defendant nonetheless told Preston that only the plaintiff wanted the divorce. He has resisted therapy for Preston. The defendant has given Preston altogether too much autonomy and independence, thereby virtually delegating to Preston the Mr. Boyd's own parental responsibilities for decision-making and supervision. The defendant has given Preston more authority than is appropriate at this stage in the young man's life. His decision to leave Preston at home all day on Saturday without adult supervision or presence exemplifies the defendant's inattentiveness to his parental responsibility for supervision. It is true, as his father said, that Preston has in the past generally made good choices and that he has not been a behavior problem at home or school. Yet good boys can get into CT Page 15688 trouble, even ones who have always made good choices in the past. Too often judges of the superior court sitting in the juvenile or geographical area courts see teenagers of Preston's age who have gotten into trouble for the first time. At age fifteen, Preston still needs the guidance and supervision of his parents to help him, in the last years of minority as he approaches adulthood, navigate the many tricky shoals of later adolescence.
On the other side of the equation, the plaintiff, Preston's mother has, for most of Preston's life, organized his day-to-day activities. She still has responsibility for many of her child's day-to-day tasks, such as making his doctor's appointments, getting his sports uniforms ready, etc. Yet Preston chafes under her intrusive and controlling style, which she has not sufficiently moderated to accommodate her son's legitimate growing needs for independence. As Dr. Bergen noted, the plaintiff has had difficulty letting go and giving Preston sufficient privacy, personal space and autonomy. Preston emulates his father's disregard and contempt for her. He believes his relationship with his mother to be irreparably impaired. Preston does not confide in his mother and if she were the primary custodial parent, she might lack sufficient input from Preston to make, or help him make, informed decisions.
Under these circumstances, the court concludes that it is not in Preston's best interest to award sole custody to the defendant father, despite their closer relationship, as the defendant has made clear his unwillingness to exercise sufficient parental authority and supervision and his lack of understanding of the importance in doing so. An order of sole custody to the plaintiff mother is similarly not in Preston's best interest; the deterioration of his relationship with his mother, whatever its causes, and Preston's alliance with his father both lead to the conclusion that Preston is unlikely to confide in his mother or to share information that a parental decision-maker needs. The court thus concludes that Preston's best interest requires that both parents share in the parental decision-making roles.
The defendant's unwillingness to communicate with the plaintiff, however, would make any order of joint custody problematic without some method of regular intervention. Dr. Bergen recommended an order of joint custody, and for the parties to be ordered to consult regularly with a parent coordinator to assist them in sharing joint decision-making. Since neither parent is appropriate for an order of sole custody, the court concurs with her recommendations, and will detail its orders in this respect more fully below. After considering all relevant factors, the court finds that an order of joint custody is in Preston's best interest. CT Page 15689
Preston wants to spend more time with his father than his mother but is, according to his attorney, amenable to accepting the parenting schedule recommended by Dr. Bergen, which the court also finds to be in Preston's best interest, with one exception. Dr. Bergen recommended that Preston move back and forth between his parent's homes during the academic year, spending alternating weekends from Friday after school to Monday morning with his mother and the other week with her from after school on Wednesday until Friday morning. The court finds that schedule to be suitable and in Preston's best interest, except that the court finds that it is not in Preston's best interest to spend Saturdays alone, unsupervised, and without any adult presence in his household. The court therefore orders the plaintiff to have parenting time during the academic year on alternating weekends, from Friday after school to Monday morning on one weekend and from Wednesday after school until Saturday at 6 p.m. on the other weekend. Other times, the defendant will have parenting time. During summers, Preston will spend every Thursday morning until Sunday morning at 11:00 a.m. with his mother.
Under General Statutes § 46b-56 (g), the court may, in making custody or visitation decisions, order either parent or the minor to engage in counseling if in the best interest of the minor child. The court finds that it is in the best interest of Preston for him to continue in counseling with Dr. Solinger. It is also in his best interest for both his parents to participate in counseling to help restore Preston's relationship with his mother, help the defendant learn how to provide sufficient supervision and guidance for his teenage son, help the plaintiff moderate her controlling parenting style, and help plaintiff and defendant develop communication skills or procedures that will enable them to share in the joint decision-making that joint custody requires. The court's orders will address these needs in more detail.
B. Financial Orders
The remaining issues facing this court concern the relevant financial orders: child support, alimony, classification and distribution of marital property, and allocation of counsel fees. The plaintiff requests an award of lifetime alimony of $750 per week (which annualizes to $39,000). For a property distribution, she proposes that she be allowed to retain possession of the marital home until July 2005, after which the property would be sold and proceeds divided equally between the parties; half of all jointly-owned stocks and securities; retained ownership of stocks, securities, or deferred compensation now in her individual name; the joint checking account; the Mercedes motor vehicle; the Ansbury boat and trailer; all her jewelry and half the household possession; and a CT Page 15690 lump sum transfer of cash from the defendant to her of $70,000. The net effect of her requested property distribution is to divide all marital assets approximately equally (when one takes into account the approximately $200,000 that the defendant expects to inherit when the estate of his deceased mother is settled).
The defendant, on the other hand, proposes to pay the plaintiff alimony in the lesser amount of $1,000 per month (or $12,000 annually) for a term of five years. For distribution of the parties' assets and property, he requests that the court award him title to the unmortgaged marital home worth, the approximately $65,000 in his personal and business checking accounts, approximately $170,000 in his deferred compensation, and his expected inheritance; he proposes that the court award the rest of the marital estate, including all stocks, bonds, and securities, to the plaintiff. The net effect of the defendant's proposal would be to award him more than 70% of all marital assets, and approximately the same percentage of all jointly-owned assets (treating the business and its assets as joint property) after segregating out his inheritance and plaintiffs individual owned assets.
1. Property
"There are three stages of analysis regarding the equitable distribution of each resource; first, whether the resource is property within Section 46b-81 to be equitably distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties." Krafick v. Krafick, 234 Conn. 783,792-93 (1995). After reviewing the parties' financial affidavits, and considering the trial exhibits and testimony, the court finds that all assets listed on each party's financial affidavit are property subject to equitable distribution in the dissolution of this marriage.[1] The largest single asset owned by the parties is the marital home, which was worth $650,000 in February of this year.[2] The other assets consist of various stocks and securities that each party valued as worth approximately $300,000,[3] IRA's and other deferred compensation worth approximately $240,000, bank accounts of approximately $65,000, and vehicles and other personalty worth approximately $100,000.
Among the many factors mandated for the court to consider in equitably dividing the marital estate, the defendant emphasizes his claim that he brought significantly more resources to the marriage than the plaintiff did, and has contributed significantly more financially during the marriage than she did. Although he has claimed that he had a net worth of $1.2 million dollars just prior to the marriage, able cross-examination CT Page 15691 by plaintiffs counsel showed discrepancies in his claim as to that particular dollar amount; there is no doubt, however, that his financial estate was worth many times more that of the plaintiff at the time of their marriage. He had an interest in several parcels of real property whose sale before or after the marriage netted him close to one-half million dollars, and the marital home, which he owned before the marriage, was worth at least $355,000 when the parties married. Most of his premarital assets the defendant received by way of inheritance from his father. The plaintiff, on the other hand, brought far less financially to the marriage.
The defendant also complains about the fact that the plaintiff has used joint assets to pay for her counsel fees and other legal expenses associated with this divorce, action he contrasts with his use of what he would characterize as his own individual resources. Yet the court notes that it has found all of plaintiffs and defendant's assets to be marital assets subject to equitable distribution; thus whether she paid dissolution expenses from jointly-owned assets and he paid them from individual assets is inconsequential to the court's financial orders. The plaintiff's proposal to divide the marital assets virtually equally, on the other hand, does not give fair consideration to the source of most of those assets.
After considering all the factors set forth in § 46b-81, the court finds that a fair and equitable division of marital property is to award the plaintiff half the value of the marital home; one-third of all individually or jointly-owned stocks or securities; one-third of the amount in the business checking account and of the business's accounts receivable at the end of trial; all of her individually-owned retirement or deferred compensation funds; title to the defendant's Janus SEP IRS; title to the joint checking account; the Mercedes Benz and boat trailer listed on her financial affidavit; all the jewelry in her possession; and half the value of household furnishings, antiques, and art. The court awards to the defendant, as fair and equitable distribution, title to and possession of the marital home; two-thirds of all individually or jointly-owned stocks or securities; ownership of his Vanguard SEP IRA; the motorcycle and trailer listed on his financial affidavit; the Chevrolet and GMC Sierra listed on his financial affidavit; two-thirds of the amount in the business checking account, two-thirds of his business receivables, and all his business assets; half the value of household furnishings, antiques, and art; and the inheritance from his deceased mother.
2. Alimony
CT Page 15692
The plaintiff has requested lifetime alimony, while the defendant insists that term-limited alimony is appropriate in this case in view of the length of the marriage and plaintiff's vocational capacity. Although the plaintiff now works as a paraprofessional in the Wilton public schools and earns far less than the defendant, she is a college graduate, has a present earning capacity greater than her present income, and has the potential to gain additional vocational skills and experience that could net her more income than she now earns. Her facility for working with students could, with additional education and training, lead her into a more professional and lucrative position in education or working with young people. Furthermore, when selling cosmetics, she earned about the same income in only two to three evenings and one weekend day as she now earns; that prior experience shows that she now could be earning more than she presently does. Limiting the term of alimony would provide an incentive for plaintiff "to use diligence in procuring training or skills necessary to attain self-sufficiency." Roachv. Roach, 20 Conn. App. 500, 506, 568 A.2d 1037 (2000).
The court thus concludes that time-limited alimony is appropriate in this case. See Ippolito v. Ippolito, 28 Conn. App. 745, 751ff, 612 A.2d 131
(1992). For a period of years, however, until she has had time to complete further education or training, she will need alimony to meet her own needs (and care for Preston while he is with her). After considering all the factors mandated by § 46b-82, the court orders the defendant to pay alimony to the plaintiff in the amount of $725 per week for eight years, by which time she will have had opportunity to obtain additional vocational training and skills and thereby increase her earnings.
3. Child support
The defendant has not requested an award of child support. The court finds that the presumptive child support amount, taking into consideration that the plaintiff contributes $10 weekly towards health insurance for the minor child, is $52 per week. The court further finds, however, that the plaintiff will have substantially increased expenses as a result of the shared parenting orders entered here, and that the defendant will have sufficient resources to meet Preston's basic needs without an award of child support. The court finds that it would be accordingly equitable and just to deviate from the presumptive guidelines amount and enter no award of weekly child support.[4] Pursuant to the child support guidelines, however, the court orders the plaintiff to pay 17.4% of unreimbursed health-related expenses exceeding one hundred dollars per year and the defendant 82.6%. (The defendant will be responsible for the first one hundred dollars of unreimbursed expenses each year.) CT Page 15693
4. Counsel fees
The plaintiff has requested that the defendant pay reasonable counsel fees to her. The defendant requests that each party pay its own counsel fees and that they split equally the fees for the AMC. Pursuant to general statutes § 46b-62, the court has authority to order payment of counsel or AMC fees after consideration of "their respective abilities and the criteria set forth in section 46b-82." Moreover, the court must take care that its determination of this question does not substantially undermine its other financial orders.
In determining whether to award counsel fees, the trial court must consider the total financial resources of the parties in light of the statutory criteria, which the court must apply in light of the following three broad principles. First, such awards should not be made merely because the obligor has demonstrated an ability to pay. Second, where both parties are financially able to pay their own fees and expenses, they should be permitted to do so. Third, where because of other orders, the potential obligee has ample liquid funds, an allowance of counsel fees is not justified. If, on the basis of the total financial resources of the parties, the trial court concludes that denying an award of counsel fees would not undermine its purpose in making its prior financial orders, the court should allow each party to pay his or her own counsel fees. Miller v. Miller, 16 Conn. App. 412, 418, 547 A.2d 922
(1988). (Citations omitted; quotations omitted.)
The court has reviewed the affidavit of fees submitted by counsel for the minor child and finds that a fair and reasonable fee for the services she performed is $37,387. Taking into consideration all the statutory factors mandated by § 46b-62, as elucidated by the Appellate Court inMiller v. Miller, the court awards no counsel fees to either party and orders them to divide equally the fees of the attorney for the minor child.
 III — ORDERS 
The court has carefully considered all of the evidence, including the exhibits and the testimony presented, according to the standards required by law. The court has observed the demeanor of the parties and evaluated their credibility. After considering all the statutory criteria for dissolving a marriage and entering orders regarding equitable distribution of property, alimony, support of minor children, orders of life and health insurance, and payment of the children's health expenditures, and the award of counsel fees, together with applicable CT Page 15694 case law and the evidence presented here, the court hereby enters the following orders:
1. Dissolution of marriage: The marriage of the parties, having broken down irretrievably, is hereby dissolved.
2. Parenting Orders:[5] The parties shall share joint legal and physical custody of their minor child as follows:
a) The plaintiff will have parenting time during the academic year from Friday after school to Monday morning on one weekend and from Wednesday after school until Saturday at 6 p.m. on the other weekend. The defendant will have parenting time at all other times.
b) During summers, Preston will spend every Thursday morning until Sunday morning at 11:00 a.m. with his mother, and the remainder of his time with his father, except that each parent may also have two weeks of exclusive parenting time with Preston during the summer. The plaintiff and defendant shall agree by April 1 of each year which two weeks in the summer will be each parent's exclusive time with Preston; if they have not so agreed by that time, plaintiff may select her weeks of exclusive time and notify defendant of her selection by April 15, and defendant shall then, by April 30, notify defendant of which remaining weeks he will exercise his exclusive two weeks of parenting time.
c) Preston will spend each March school vacation and one of the two extended school weekends (in February and April of each year) with his mother.
d) For the Christmas / New Year's school vacation in 2002, the plaintiff will have parenting time from the end of school until Christmas morning at 10:00 a.m., and the defendant thereafter until Preston's return to school. The parents shall rotate these periods annually.
e) Preston's parents shall alternate all other major legal holidays. He shall spend mother's day with plaintiff and father's day with defendant.
f) Preston may spend additional time as he desires with his mother, but other than as specified above or as elected by him, the defendant shall have the remaining parenting time.
g) Both parents shall treat each other with respect and courtesy. Neither parent shall make any derogatory remarks about the other parent in front of Preston or within his hearing. Each parent shall seek to foster a close, loving, respectful, and positive relationship between CT Page 15695 Preston and the other parent.
h) Both parties shall immediately notify the other of any serious or emergency health issues involving Preston when he is with that parent, and shall keep the other party informed of routine health matters involving the child.
i) The parties shall jointly select a third person who will serve in the role of parenting coordinator. They will meet jointly with each other and the parenting coordinator at least every six weeks to share and discuss information each parent needs to know in order to make informed parenting decisions. If the parties cannot agree on the identify of such a third person within thirty days of the date of this decision, they shall submit the names of any persons each party would propose to serve in that capacity to the attorney for the minor child within that same time period. See paragraph 3 b) below for further orders regarding the parenting coordinator.
3. Counseling for parties and minor child pursuant to General Statutes§ 46b-56 (g):
a) The parties shall ensure that Preston engages in regular therapy with Dr. Irwin Sollinger until Dr. Sollinger releases Preston from further therapy. Each party shall participate in such therapy as often as, and to the extent, requested by Dr. Sollinger.
b) The costs of Preston's therapy shall be borne pursuant to paragraph 5 c) below, "Unreimbursed health-related expenses and care expenses." The parties each pay for their own participation in any therapy requested by Dr. Sollinger.
c) The plaintiff and defendant shall each engage in joint counseling, with a therapist or counselor of their mutual choosing, for the purpose of learning to communicate with each other and make decisions jointly in Preston's best interest. Such counseling shall commence within sixty days of the date of this decision. If the parties have not agreed on the therapist to conduct such counseling within thirty days, they shall each submit to the AMC the names of three counselors they propose within the same thirty days, and the AMC shall engage in such mediation efforts as she deems appropriate. If an agreement is reached within 45 days from the date of this decision, a stipulation designating the selected counselor shall be submitted to the court. If an agreement is not reached through the AMC, then the AMC shall notify the court within the same 45 days and the court shall decide. They will meet jointly with each other and the counselor at least every six weeks, or more frequently if recommended by CT Page 15696 the counselor, to share and discuss information each parent needs to know in order to make informed parenting decisions. The parties shall split the cost of such counseling. The court retains jurisdiction over the terms of this paragraph.
4. Equitable distribution of property:
a) The court awards title in the marital home located at 74 Turtle Back Road in Wilton exclusively to the defendant husband, free of any claim of the plaintiff. The plaintiff shall by quitclaim deed convey all of her right, title and interest in such property within thirty days of this decree. The defendant shall simultaneously transfer to the plaintiff a mortgage note secured by that property in the amount of $325,000. The defendant shall, within ninety days thereafter, transfer to the plaintiff the sum of $325,000.
b) The plaintiff shall retain said lien on the marital home as security for the defendant's payment of alimony to her until such time as plaintiffs obligation to pay alimony has ended, or until such time as plaintiff provides other security, in the form of a bond or life insurance payable to plaintiff, for the payment of alimony. The order in this paragraph may be modified upon a showing of a substantial change in circumstances.
c) The following assets listed as jointly owned on each party's financial affidavit are ordered divided, within the next thirty days, such that the plaintiff receives one-third and defendant two-thirds of each such asset as of the day of division of each such asset: 200 shares Fleet Boston stock, 200 shares GlaxoSmithKline stock, 200 shares of Mellon Bank stock, 562 shares of Pfizer stock, 122 shares of Verizon stock, 322 shares of Worldcom stock, 400 shares of Microsoft stock, and 2960.978 shares of Dreyfus Strategic Bonds. Any fractional amount received advantaging one of the parties shall be equalized through cash reimbursement to the party who does not receive the fractional share.
d) The following assets listed on plaintiffs financial affidavit as owned by her are ordered divided within the next thirty days such that the plaintiff receives one-third and defendant two-thirds of each such asset as of the day of division of each such asset: 960 shares of Nortel stock, 100 shares Goldman Sachs stock, 150 shares of Qwest stock, and 400 shares of Dell stock. Any fractional amount received advantaging one of the parties shall be equalized through cash reimbursement to the party who does not receive the fractional share.
e) The following assets listed as jointly owned on each party's CT Page 15697 financial affidavit are ordered divided within the next thirty days such that the plaintiff receives one-third and defendant two-thirds of the value, as of the day of division of each such asset:
 • The joint Fidelity Investments accounts (Ultra Service #X57-080721 and Mutual Fund #2BE-144053);
• The joint People's Securities account #220-17479;
• The joint Scudder Investments account #9978131451-8;
• The joint Vanguard account #9882939811;[6]
• The Federated Kaufman fund, account #TIN 866216; and
• The joint Morgan Stanley Dean Witter account #540-043734.
f) The court also orders division of the Fidelity account #T121661571 listed on the plaintiffs financial affidavit, within the next thirty days, such that the plaintiff receives one-third and defendant two-thirds of the value of this asset as of the day of division of the asset.
g) The court awards title to the plaintiff of the joint checking account at First Union Bank, the Mercedes Benz motor vehicle listed on her financial affidavit, the boat and trailer listed on her financial affidavit, all the jewelry in her possession, the defendant's Janus SEP IRA,[7] and the following retirement and/or deferred compensation accounts listed on her financial affidavit: five Vanguard Roth IRAs; Federated 401K plan; Fidelity IRA; Fidelity Retirement account from Wilton Public Schools; and the Fidelity Annuity FC 18823. She shall be the sole owner of such property, free of any claim of the defendant.
h) The Court awards title to the defendant of the BMW motorcycle, the 1990 Chevrolet K3500, the 2002 GMC Sierra, and the Hudson trailer listed on his financial affidavit; his personal and business checking account listed on his financial affidavit at First Union Bank; his business assets, inventory, and accounts receivable; the inheritance from his deceased mother, and the Vanguard SEP IRA listed on his financial affidavit. He shall be the sole owner of such property, free of any claim of the plaintiff.
i) The defendant shall transfer to the plaintiff within ninety days of the date of this decision the sum of 23,666.67, this amount representing one-third of the amount in the business checking account and of moneys owed to the business as an account receivable. CT Page 15698
j) The court awards title to the plaintiff of the various items she identified in footnote three of her financial affidavit as being held exclusively for the benefit of the parties' minor child.[8] She shall use such funds only for Preston's post-secondary education-related expenses. If Preston has not attended post-secondary school by age 22, she shall then transfer title and ownership of such funds to him.
k) The parties shall divide equally their household furnishings, antiques, and art. If the parties cannot agree on the division, they shall meet with Family Services within thirty days of the date of this decision to attempt to agree on how to divide this property. If they cannot so agree with the assistance of Family Services, they shall each, within thirty days after that meeting, submit to the court a list of items of such property they each claim. The court retains jurisdiction to decide any questions as to distribution of such personalty.
5. Alimony and Support:
a) Alimony — The defendant shall pay the plaintiff in alimony the amount of $750 per week for a period of eight years from the date of this decision. Alimony shall terminate upon death of either party, remarriage of the plaintiff, or her cohabitation with a male pursuant to General Statutes § 46b-86 (b).
b) Health insurance for the minor child — Under General Statutes § 46b-84 (f), the court dissolving a marriage must include provisions in the support order for health insurance coverage for any minor children. The court orders the plaintiff to maintain health insurance coverage for the minor child.
c) Unreimbursed health-related expenses[9] — The plaintiff shall pay 17.4% and defendant 82.6% of all unreimbursed health-related expenses exceeding one hundred dollars per year for the minor child.
d) Health insurance for the plaintiff — The plaintiff will cooperate with the defendant in ensuring that he has adequate and timely information so that he may elect whether to purchase COBRA health insurance for himself after this decision.
e) Educational support order pursuant to Public Act 02-218:
Pursuant to the "Stipulation re: Post-Majority Education" signed by both parties, their counsel, and the attorney for the minor child, the court retains jurisdiction to enter an educational support order pursuant CT Page 15699 to Public Act 02-218. Pursuant to Section 1(b) (i) of that act, either party may, at a future date, file a motion or petition for entry of such an order.
f) Life Insurance — The plaintiff shall continue to maintain the two life insurance policies listed on her financial affidavit for the benefit of the minor child until he reaches the age of eighteen, has graduated from high school, or whichever is later, but in no event beyond the child's nineteenth birthday. If, however, a court in the future enters an educational support order, then plaintiff shall maintain such life insurance for the benefit of the parties' child until the provisions of that order expires.
SO ORDERED.
BY THE COURT,
 STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT